IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **In Re:** | ) | |
| | ) | |
| **Express Integrated Technologies, LLC** | ) | **Case No.  16-12042-M** |
| | ) | **Chapter 7** |
| | ) | |
| **Debtor.** | ) | |

## MOTION FOR ORDER AUTHORIZING AND APPROVING SALE OF PERSONAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND WAIVER OF 14-DAY STAY

Scott P. Kirtley, Trustee of the above-captioned case, moves this Court for an Order authorizing the sale of property of the bankruptcy estate pursuant to 11 U.S.C. Section 363(b) and Bankruptcy Rules 2002(a)(2) and (c)(1) and 6004(a) and (c).  The Trustee also requests that this Court waive the 14-day stay of any final order granting this Motion and order the final relief requested in this Motion may be immediately available upon the entry of an Order Authorizing and Approving the Sale pursuant to F.R.Bankr.P  6004(h).  In support of this Motion, the Trustee would show the Court as follows:

### Background Information

1.     Express Integrated Technologies, LLC (**"EIT"**) filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code on November 9, 2016.

2.     A companion case, Express Metal Fabricators, LLC (**"EMF"**) filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code on November 9, 2016.

3.     Scott P. Kirtley is the duly appointed, qualified and acting Trustee of these cases.

4.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. Section 1334. This is a core matter pursuant to 28 U.S.C. Section 157(b)(2).  Venue of these proceedings is proper

1

pursuant to 28 U.S.C. Sections1408 and 1409.

5.      Pursuant to 11 U.S.C. Section 541, the property of the EIT bankruptcy estate being sold herein includes the following:

a.      all intellectual property, including but not limited to:

-- logos, trademarks and domain names associated with EIT,
-- all drawings, binders, books, notebooks and folders, wherever located including in the possession of former employees,
--all customer lists, and
-- all loose papers.

b.      All electronics, including but not limited to all computers, monitors, docking stations, keyboards, mice, power strips, servers cords, phones, cable, memory sticks, and components located in the EIT premises or still in the possession of former employees or contractors.

c.      All office supplies including but not limited to pens, pencils, markers, paper, staplers, hold punches, notebooks, paper clips, binder clips, and organizers located in the EIT premises.

d.      All printers and copiers that are not leased.

e.      All bookcases and files contained in the document control area identified as office 467 on the EIT office diagram attached as **Exhibit "A"**.

f.      All bookcases contained in the engineering work room identified as office 461 on the EIT office diagram attached as Exhibit "A".

g.      All shelves, bookcases, and contents in the promotional storage room identified as office 413 on the EIT office diagram attached as Exhibit "A".

h.      All shelves, cabinets, and contents in the office storage room identified as office 414 on the EIT office diagram attached as Exhibit "A".

i.      All cabinets, shelves, tables, server equipment, inspection tools, electronics and contents in the IT work room identified as office 459 on the EIT office diagram attached as Exhibit "A".

j.      All server equipment, battery back-up, network routers, modems, network switches, Allworx telephone servers, patch cables in the server room in the IT work identified as office 456 on the EIT office diagram attached as Exhibit "A".

k.      The free standing white board in the open area identified as office 458 on the EIT office diagram attached as Exhibit "A".

2

l.     All safety equipment including hard hats, gloves, first aid station, defibrillator, oxygen tank and evacuation board identified in offices 411, 412, and 461 on the EIT office diagram attached as Exhibit "A".

m.     All tools, hardware and spare parts remaining from previous projects located throughout the EIT office.

n.     Eight (8) total workstations, each containing a desk, bridge, credenza, hutch, and matching chair identified in offices 462, 463, 465 and 466 on the EIT office diagram attached as Exhibit "A".

o.     All bookcases, desks, tables, chairs and contents identified as office 459 on the EIT office diagram attached as Exhibit "A".

p.     All equipment, photos and industrial artwork, framed or otherwise, hanging on the walls or stored throughout the EIT office.

q.     Two (2) grey service carts.

r.     The 2008 Ford F-150 Pickup, VIN# 1FTPX12V88FB65182.

s.     Either the 2008 Honda Accord LXP, VIN#1HGCP26468All8060, the 2008 Honda Accord EXL VIN#JHMCP26868C002037, or the 2006 Honda Accord VP, VIN# 1HGCM56146A040164.

t.     The work in progress known as the GE Ocotillo Project, Job No. 1718, including all parts thereof.

**(the "EIT Property")**.

6.     The Trustee shall retain from the EIT Property the laptop and desktop computers in Rebecca Tomlinson's office and all corporate and financial records, paper and electronic, necessary to complete the administration of this bankruptcy estate.

7.     Pursuant to 11 U.S.C. Section 541, the property of the EMF bankruptcy estate being sold includes all assets [the equipment, tools, scrap metal, inventory (unless otherwise marked for work in progress) and rolling equipment] located in St. George, Utah and Murray, Utah, including, without limitation, the assets described in the attached **Exhibit "B" (the "EMF Property")**.

8.     The Trustee was contacted by SISU Energy & Environmental, LLC ("SISU") expressing an interest to purchase the EIT Property and the EMF Property.  SISU has offered

3

$1,220,000.00 for the EIT Property and the EMF Property.

9.      SISU has also agrees to use its best efforts to collect the approximately $1,200,000.00 in accounts receivable generated from the St. George and Murray, Utah fabrication plants on behalf of the Trustee with the Trustee receiving the first $500,000 of the accounts receivable that are collected. These account receivables are property of the EMF estate.  After the Trustee receives the first $500,000 of accounts receivable, the remaining receivables shall be split 70-30 with the Trustee receiving 70% and SISU receiving 30%.

10.     The Trustee has agreed to sell the EIT Property and the EMF Property free and clear of all liens, claims and encumbrances to SISU pursuant to the Purchase and Sale Agreement ("PSA") attached as **Exhibit "C," which PSA is incorporated herein**.

11.     BNP Paribas claims that it is a properly perfected secured creditor in and to the EIT Property and EMF Property.

12.     The Trustee has not determined whether BNP Paribas is a properly perfected secured creditor.

13.     The liens, claims, encumbrances and interests of BNP Paribas and any other creditor shall attach to the proceeds of the sale of the EIT Property and EMF Property.

## Terms of Sale

14.     The terms of the sale by the Trustee to SISU in the amount of $1,220,000.00 (or other successful bidder at a higher purchase price) are contained in the PSA.  Any other successful bidder must accept and agree to the terms of the PSA.

15.     The parties have determined that the purchase price offered by SISU is allocated as follows:

        a.      the EIT Property has a value of $455,000.00:

            -- the intellectual and personal property: $100,000.00 and

4

-- the GE work in progress: $355,000.00.

b.      the EMF Property has a value of $765,000.00.

16.      Approval of the PSA and this sale is subject to approval by the Bankruptcy Court and the consideration by the Trustee of higher or better bids.  The Trustee is permitted to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by any person in connection with any sale or disposition of the EIT Property and the EMF Property.  In addition, the Trustee has the responsibility and obligation to respond to any inquiries or offers to purchase the EIT Property and EMF Property and perform any and all other acts related thereto, including supplying information relating to the EIT Property and EMF Property to prospective purchasers.

17.      In the event the Trustee receives a higher, competing bid, the Trustee shall ask this Bankruptcy Court to conduct an auction of the EIT Property and EMF Property at the hearing to consider approval of the sale (**the "Sale Approval Hearing"**).  In such case, at the Sale Approval Hearing the Bankruptcy Court shall preside over an auction of the EIT Property and EMF Property and approve the purchase price and successful bidder.

18.      The purchase price shall be paid to the Trustee immediately after entry of the Order Authorizing and Approving the Sale and before removal of the EIT Property and EMF Property.

19.      The Trustee shall convey title to the EIT Property and EMF Property by Bill of Sale.

20.      The Trustee requests that the sale of the EIT Property and the EMF Property shall be a legal, valid and effective transfer to SISU, and vest SISU with all right, title and interest free and clear of all liens, claims, encumbrances and other interests.

21.      No representations, expressed or implied, concerning the EIT Property and EMF Property have been made by the Trustee, other than what is set forth herein and the PSA.

## Authority For Sale

22.      Pursuant to 11 U.S.C. Section 363(b), the Trustee has the power to sell property of

5

the estate.

23.     Pursuant to 11 U.S.C. Section 363(f), the Trustee is permitted to sell property of the estate free and clear of liens, claims, encumbrances and other interests.

24.     BNP Paribas consents to this sale.

25.     Sale of the EIT Property will eliminate an administrative rent claim of $22,380 per month.

26.     Sale of the EMF Property will eliminate an administrative rent claim of $14,000 per month.

27.     The Trustee believes that he has demonstrated sound business judgment in negotiating the price for the EIT Property and EMF Property, has acted on an informed basis, and has maximized the value of these assets.

28.     The Trustee further believes that the Purchase Price is fair and reasonable consideration for the EIT Property and EMF Property because it represents the product of extensive arm's length negotiations among the Trustee, counsel for BNP Paribas and SISU.

29.     The Trustee contends the sale of the EIT Property and EMF Property is in the best interests of the respective bankruptcy estates.

## Sale Approval Hearing

30.     By separate Order Shortening Notice and Setting Hearing, a Sale Approval Hearing has been set before the Honorable Terrence L. Michael, Chief United States Bankruptcy Judge, in Courtroom No. 2, of the Federal Building, United States Bankruptcy Court, 224 S. Boulder Ave., Tulsa, Oklahoma, 74103, to consider any objections and auction the EIT Property and EMF Property, if necessary.

31.     Objections to the relief requested in this Motion must be filed and served in accordance with the Order Shortening Notice and Setting Hearing.  If no objection is timely filed or

6

served, the Court may strike the hearing and grant the requested relief without further notice or a hearing.

32.     Higher, competing bids must be received by the Trustee in accordance with the Order Shortening Notice and Setting Hearing.  If a higher, competing bid is timely received, the Court shall preside over an auction of the EIT Property and EMF Property and approve the purchase price and successful bidder at the Sale Approval Hearing.  If no higher, competing bid is timely received, the Court may strike the hearing and grant the requested relief without further notice or a hearing.

**WHEREFORE**, Scott P. Kirtley, Trustee of the above-captioned case moves this Court to:

a.  Authorize and approve the sale of the EIT Property and EMF Property,

b.  Authorize the Trustee to perform his obligations under the PSA,

c.  Consider any objections to the sale at the Sale Approval Hearing,

d.  Preside over an auction at the Sale Approval Hearing of the EIT Property and EMF Property in the event there is a higher, competing bid for the EIT Property and EMF Property,

e.  Waive the 14-day stay imposed by F.R.Bankr.P 6004(h), and

f.  Enter such other relief as the facts may warrant and justice so requires.

*Respectfully submitted this 9th day of January, 2017.*

RIGGS, ABNEY, NEAL
TURPEN, ORBISON & LEWIS

*Scott P. Kirtley*

Scott P. Kirtley, OBA No. 11388
502 West 6th Street
Tulsa, Oklahoma  74119-1010
Telephone: (918) 587-3161
Facsimile: (918) 587-9708

Attorneys for Trustee

7



ST. GEORGE STEEL
FIXED ASSET

| SGS Location | Description | Serial # | Acquisition Date |
|---|---|---|---|
| | **OFFICE EQUIPMENT** | | |
| | **St.George:** | | |
| St George Office | Electronic timekeeping system-Legiant | (non transferable) | 5/31/07 |
| St George Office | SDS/2 detailing software | (non transferable) | 7/10/07 |
| St George Office | Network File Server(server2) | | 8/8/08 |
| St George Office | AutoCAD 2012-additional license | (non transferable) | 5/5/2011 |
| St George Office | Dell PowerEdge T610 server | 00168-271-441-101 | 7/20/2011 |
| St George Office | Sharp Color Copier MX-4111N | 15021639 | 11/30/2011 |
| | | | |
| | *Subtotal-St George Office Equip* | | |
| | | | |
| | **FABRICATING EQUIPMENT** | | |
| | **St. George:** | | |
| St George Shop | Sullair TS32-300 Compressor | 003-117798 | 5/99 |
| St George Shop | P & H New Hevi-lift Hoist | N34CN31G | 6/99 |
| St George Shop | Lincoln DC600 Welder(1201) | U1990309410 | 1/00 |
| St George Shop | Lincoln DC600 Welder(1205) | U1990309341 | 1/00 |
| St George Shop | Lincoln LN8 Wire Feed | U1990835494 | 1/00 |
| St George Shop | Lincoln LN8 Wire Feed | U1990835495 | 1/00 |
| St George Shop | Lincoln DC1000 Power Source | U1990502071 | 5/00 |
| St George Shop | Lincoln DC1000 Power Source | U1000105305 | 5/00 |
| St George Shop | Lincoln LN-9 Feeder | U1990613641 | 5/00 |
| St George Shop | Lincoln LN-9 Feeder | U1990300647 | 5/00 |
| St George Shop | Miller 450amp Welder & wire feeder | JB467489/JE830183 | 8/00 |
| St George Shop | Miller 650amp Welder & Lincoln wire feeder | JB525738/U1951110710 | 8/00 |
| St George Shop | Lincoln DC600 Welder | U1000405983 | 2/01 |
| St George Shop | Lincoln DC600 Welder | U1001012309 | 2/01 |
| St George Shop | Lincoln DC600 Welder | U1000934757 | 2/01 |
| St George Shop | Lincoln DC600 Welder | U1001120983 | 2/01 |
| St George Shop | Lincoln LN8-CV Wire Feeder | U1001004463 | 2/01 |
| St George Shop | Lincoln LN8-CV Wire Feeder | U1001004462 | 2/01 |
| St George Shop | Lincoln LN8-CV Wire Feeder | U1001004441 | 2/01 |
| St George Shop | Lincoln LN8-CV Wire Feeder | U1001004437 | 2/01 |
| St George Shop | Ingersoll Port. Air compressor | 221786 | 3/01 |
| St George Shop | Sullair Air Compressor TS32-300 | 003-125438 | 5/01 |
| St George Shop | Pandjiris 11" vertical welding manipulator | 800-4432-5 | 6/01 |
| St George Shop | Unique Readco Welding Positioner | | 6/01 |
| St George Shop | Ransome 20,000 lb welding positioner | | 6/01 |
| St George Shop | 90 Ton Tank turning rolls | | 6/01 |
| St George Shop | Used Worthington 400 P weilding positioner | 53222 | 7/01 |
| St George Shop | Bertsch Model 87-10 four roll machine | | 7/01 |
| St George Shop | Used Miller Delta Welder 652 & feeder | LB025219 | 9/02 |
| St George Shop | Portable Drilling Machine-Hearn | | 2/03 |
| St George Shop | Used Portable Drilling Machine-Hearn | | 2/03 |
| St George Shop | Uni-Bug II Welding Kit | 0300603 | 6/03 |
| St George Shop | Lincoln LT-7 Tractor subarc welder | U1030809477 | 9/03 |
| St George Shop | Uni-Bug II Welding Kit | 0021003 | 10/03 |
| St George Shop | Sidewinder M2 Solvent Recycler | | 8/04 |
| St George Shop | 3 Miller Welding Stations | AirGas3104581144 | 7/22/05 |
| St George Shop | Paint Storage shed-Job 9996.31 (container) | | 4/30/06 |

Ex B

ST. GEORGE STEEL
FIXED ASSET

| SGS Location | Description | Serial # | Acquisition Date |
|---|---|---|---|
| St George Shop | GEKA Ironworker Model hydracrop 110AD | 20943 | 8/2/06 |
| St George Shop | Case 580B Backhoe w/forks (doesn't work) | 5227405 | 6/29/06 |
| St George Shop | Used 1996 JLG Propane manlift (damaged) | 034871030025340 | 8/24/06 |
| St George Shop | Yale Forklift Model GDP360EB (short mast) | B877E01507Z | 9/18/06 |
| St George Shop | DPH 125 Hydraulic profile roll | 440V 3PH | 12/21/06 |
| St George Shop | Trailblazar 302 Onan Welder | LG092832 | 12/28/06 |
| St George Shop | 60' JLG Boomlift Model 60H (damaged) | 3000023868 | 9/14/07 |
| St George Shop | Invertec V350-PRO welder & feeder | V1071007232 | 12/14/07 |
| St George Shop | Invertec V350-PRO welder & feeder | V1071007233 | 12/14/07 |
| St George Shop | Invertec V350-PRO welder & feeder | V1071002940 | 12/14/07 |
| St George Shop | Shop camera monitoring system-Peak Alarm (installed) | | 3/31/08 |
| St George Shop | Used Massey Ferguson MF 50A Tractor (scrap) | 1664 51 MIC | 1/18/08 |
| St George Shop | 3- 2T electric chain hoists NER020L-20 | NER1A 85SY5363-00133203/2( | 9/12/08 |
| St George Shop | Precision TIG 375 welder | U1080702704 | 12/10/08 |
| St George Shop | Pythonx structural fabrication system | 3HAC-17851-2 | 12/15/08 |
| St George Shop | Wel-Handy Multi Stitch Model 61001072 | 078327 | 9/30/2009 |
| St George Shop | Nelson Series 4500 Model 101 stud gun | 1012004 | 2/17/2010 |
| St George Shop | Nelson NS20HD Hvy Duty stud gun | HGC1080 | 3/29/2010 |

ST. GEORGE STEEL
FIXED ASSET

| SGS Location | Description | Serial # | Acquisition Date |
|---|---|---|---|
| St George Shop | Miller Trailblazer welder | A107200453 | 4/28/2010 |
| St George Shop | Used 80-ton tank turning rolls w/idlers & misc | | 4/29/2010 |
| St George Shop | Ceram 35 CF2000 x-ray machine | 2108300/06(control) & 29770 | 6/29/2010 |
| St George Shop | Shop camera monitoring system (computers) | | 10/1/2010 |
| St George Shop | Morris Radial Arm Drill Model G504 | R77006243 | 3/22/2011 |
| St George Shop | 2008 PCS 4000HD Plasma cutting machine | | 12/14/2011 |
| St George Shop | Powermax 85 welder w/ 50' hand torch | 85-008256 | 2/9/2012 |
| St George Shop | Frejoth International CZE-20 tank turning rolls | #N4862 | 6/5/2012 |
| St George Shop | JMT DZG-40 tank turning rolls | #JMT123 | 6/5/2012 |
| St George Shop | Gator UTV for maintenance department | #MOHP4GX019156 | 7/19/2012 |
| St George Shop | Used 1984 Amada Angle Machine (Job 9995.14) | Ser #830110 | 2/28/2014 |
| St George Shop | Lincoln Pulse welder S500 | Ser #U1130901756 | 3/13/2014 |
| St George Shop | DGZ-60 60-ton tank turning roll | Serial# SS 2140521 | 7/2/2014 |
| St George Shop | DSQC639 Main Computer for Python | Serial # 3HAC041443-003 | |
| St George Shop | Drop Deck Trailer for moving items in yard/shop (used) | Serial # 1DA71C708DM007294 | 10/3/2014 |
| St George Shop | Airgas USA Welding System 230/460V | Inv 9035471504 | 1/20/2015 |
| St George Shop | Transferred from ST2 -500# Welding Positioner | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - 500# Welding Positioner | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - 3-Ton Capacity Drive Roll & Kit | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - 3 Ton Idler Roll | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Roller Conveyor for Shop | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Fixtures for Shop | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Print Stand for Shop Dwgs | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Channels for conveyor sections | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Channels for conveyor sections | USED ? | 4/22/2016 |

*Subtotal-St George Mach & Equip*

C:\Users\skirtley\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BZ2UGW3X\SGS Asset List 10-2016

ST. GEORGE STEEL
FIXED ASSET

| SGS Location | Description | Serial # | Acquisition Date |
|---|---|---|---|
| | **AUTOS AND TRUCKS** | | |
| | **St. George:** | | |
| St George Autos | 89 Great Dane Trailer  (GW Lease #D4321) | 1GRDM9025KM034321 | 5/17/91 |
| St George Autos | 89 Great Dane Trailer  (GW Lease #D4304) | 1GRDM9025KM034304 | 5/17/91 |
| St George Autos | 89 Great Dane Trailer   (GW Lease #D4324) | 1GRDM9020KM034324 | 5/18/92 |
| St George Autos | 89 Great Dane Trailer  (GW Lease #49706) | 1GRDM9023KM089706 | 6/5/92 |
| St George Autos | 93 Dodge Ram 350 Pick-up | 1B7ME36CXPS112602 | 10/19/92 |
| St George Autos | 86 Trailmobile Drop Flat Bed Trlr (scrap) | 1PTH43DJ1G7720503 | 7/13/95 |
| St George Autos | 89 Cozad 16-tire basket trailer | 1C9L12201K1167056 | 3/29/96 |
| St George Autos | 96 Murray Dolly Trailer | UTT17435 | 9/19/96 |
| St George Autos | 95 Ford F150 Pickup-Trucking | 1FTEF15N0SNA54242 | 4/10/97 |
| St George Autos | 97 Fontaine EDFT Step Deck Trailer | 13N248309V1577131 | 5/2/97 |
| St George Autos | 97 Trailmobile Flatbed Trailer F71t-5UAA | 1TPF71TH6V9003940 | 5/29/98 |
| St George Autos | Yale Forklift Model GDP360EA | A877D01563W | 12/20/99 |
| St George Autos | Yale Forklift Model GDP360EA | A877D01564W | 12/20/99 |
| St George Autos | Yale Forklift Model GDP360EA | A877D01537W | 12/20/99 |
| St George Autos | 99 Ford F355 Pickup-Trucking | 1FTWX33F5XEA21124 | 7/25/00 |
| St George Autos | 96 Fontaine DDF Stretch FB trailer  & 3rd axel unit | 13N653298T1571805 | 10/24/00 |
| St George Autos | 01 Fontaine low boy trailer | 13N65330211597555 | 3/5/01 |
| St George Autos | 01 Chevy Tahoe-Mike | 1GNEK13T01R159987 | 3/19/01 |
| St George Autos | 96 Volvo Model WIA64TTES Truck (See also rebuilt engine | 4V4WDBCH5TN733216 | 3/29/01 |
| St George Autos | 96 Volvo Model WIA64TTES Truck (See also rebuilt engine | 4V4WDBCH7TN733217 | 3/29/01 |
| St George Autos | 02 Kenworth T800B Truck Tractor | 1XKDDB9X42R889230 | 9/17/01 |
| St George Autos | 02 Kenworth T800B Truck Tractor | 1XKDDB9X62R889231 | 9/17/01 |
| St George Autos | 02 Kenworth T800B Truck Tractor | 1XKDDB9X12J893573 | 1/2/02 |
| St George Autos | 2007 Manac Trailer x-flat | 2M 512146671111474 | 10/16/06 |
| St George Autos | 1996 Wabash flatbed trailer 48' X 102" | 1JJF448272TL323354 | 5/17/07 |
| St George Autos | 1996 Wabash flatbed trailer 48' X 102" | 1JJF48270TL378031 | 5/17/07 |
| St George Autos | 2003 Ford Windstar Van | 2FMZA51443BB18778 | 6/21/07 |
| St George Autos | 05 Ravins Trailer | 1R1F248295K550826 | 7/13/07 |
| St George Autos | 07 Ford Ranger 4X2 Supercab pickup(Evert) | 1FTYR14U57PA46596 | 7/21/07 |
| St George Autos | 07 GMC Sierra CC/SB 4WD pickup(Ashley) | 1GTHK23637F561308 | 10/31/07 |
| St George Autos | 2007 Honda ATV for yard | 1HFTE344374011175 | 12/9/08 |
| St George Autos | Used Cozad Jeep Dolly & stinger | | 2/4/2009 |
| St George Autos | 2005 Walton Trailer (#2A92B53385R023114) | | 11/7/2012 |
| St George Autos | 2010 Honda Civic GX Sedan (#19XFA4F55AE000117) | | 1/2/13 |

*Subtotal-St George Vehicles*

C:\Users\skirtley\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BZ2UGW3X\SGS Asset List 10-2016

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made by and between Purchaser and Seller as of the Effective Date.

### RECITALS

Whereas EIT and EMF (as defined below) filed voluntary petitions for relief under Chapter 7 of Title 11 of the United States Code on November 9, 2016, under case numbers 16-12042-M and 16-12041-M respectively, and,

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

### 1.
### DEFINITIONS

1.1    As used herein, the following terms shall have the meanings set forth below in this Section 1.1:

BASIC TERMS:

Closing shall mean the act of settlement of the purchase and sale of the Property in accordance with this Agreement at which, among other matters, title to the Property is conveyed from Seller to Purchaser and the Purchase Price is paid by Purchaser to Seller.

Closing Date shall mean as soon as practicable after approval of the Bankruptcy Court.

Effective Date shall mean the date this Agreement is last executed by Purchaser and Seller (whether in counterparts or not).

EIT shall mean Express Integrated Technologies, LLC.

EMF shall mean Express Metal Fabricators, LLC.

Property shall mean, collectively, Seller's right, title and interest in the below-described tangible and intangible property, comprising the EIT Property and the EMF Property.

Purchaser shall mean SISU ENERGY & ENVIRONMENTAL, LLC, an Oklahoma limited liability company, whose address for notice under this Agreement is as follows:

Ex C

5801 East 41st Street, Suite 1005
Tulsa, Oklahoma 74135
Attn: John Hare
Tel: (918) 271-7324
Fax: (918)-346-6398
Email: jhare@sisu-ee.com

with a copy to:

Hall, Estill, et al
320 S. Boston Ave, Ste. 200
Tulsa, OK  74103

_____

Attn:  Steve Soule
Email: ssoule@hallestill.com
Tel: (918) 594-0466
Fax: (918) 594-0505

Purchaser's Inspection Rights shall mean that upon full execution of this Agreement, Purchaser acknowledges and agrees that it has already been afforded the right to conduct any inspection of the Property deemed advisable, and is satisfied with the results of same; provided, that pending Closing, Seller shall permit Purchaser full access to the Property.

Seller shall mean Scott P. Kirtley, Trustee of the bankruptcy estates of Express Integrated Technologies, LLC, Case No. 16-12042-M, and Express Metal Fabricators, LLC, Case No. 16-12041-M, whose address for notice under this Agreement is as follows:

502 West 6th Street
Tulsa, Oklahoma 74119
Tel: (918) 587-3161
Fax: (918) 587-9708
Email: skirtley@riggsabney.com

Condition Precedent – Trustee's Rights and Obligations shall mean that this Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better bids.  By way of further explanation, from the date hereof (and any prior time) and until the sale is approved by the Court, Seller is permitted to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by any person in connection with any sale or disposition of the Property.  In addition, Seller has the responsibility and obligation to respond to any inquiries or offers to purchase the property and perform any and all other acts related thereto, including supplying information relating to the Property to prospective purchasers.

## 2.
## PURCHASE AND SALE

2.1   Purchase and Sale.  Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the Seller's assignable and transferable right, title and interest in and to the Property, free and clear of all liens, encumbrances and adverse claims.

## 3.
## PURCHASE PRICE

3.1   Purchase Price.  The Initial Cash Payment (as defined below) shall be paid in cash or other immediately available funds by Purchaser to Seller at the Closing by wire transfer in accordance with wire transfer instructions to be provided by Seller.

## 4.
## TERMS OF PURCHASE

Purchaser shall pay Seller at Closing the sum of One Million Two Hundred Twenty Thousand and No/100 U.S. Dollars ($1,220,000.00) ("Initial Cash Payment") for the following tangible and intangible property of the Seller:

4.1   The property of the EIT estate being sold includes the following:

   a.   all intellectual property, including but not limited to:

      i.    logos, trademarks and domain names associated with EIT,
      ii.   all drawings, binders, books, notebooks and folders, wherever located including in the possession of former employees, contractors and subcontractors, and
      iii.  all loose papers.
      iv.   all customer lists

   b.   All electronics, including but not limited to all computers, monitors, docking stations, keyboards, mice, power strips, servers cords, phones, cable, memory sticks, and components located in the EIT premises or still in the possession of former employees.

   c.   All office supplies including but not limited to pens, pencils, markers, paper, staplers, hold punches, notebooks, paper clips, binder clips, and organizers located in the EIT premises.

   d.   All printers and copiers that are not leased.

   e.   All bookcases and files contained in the document control area identified as office 467 on the EIT office diagram attached as **Exhibit A**.

f.    All bookcases contained in the engineering work room identified as office 461 on the EIT office diagram attached as Exhibit A.

g.    All shelves, bookcases, and contents in the promotional storage room identified as office 413 on the EIT office diagram attached as Exhibit A.

h.    All shelves, cabinets, and contents in the office storage room identified as office 414 on the EIT office diagram attached as Exhibit A.

i.    All cabinets, shelves, tables, server equipment, inspection tools, electronics and contents in the IT work room identified as office 459 on the EIT office diagram attached as Exhibit A.

j.    All server equipment, battery back-up, network routers, modems, network switches, Allworx telephone servers, patch cables in the server room in the IT work identified as office 456 on the EIT office diagram attached as Exhibit A.

k.    The free standing white board in the open area identified as office 458 on the EIT office diagram attached as Exhibit A.

l.    All safety equipment including hard hats, gloves, first aid station, defibrillator, oxygen tank and evacuation board identified in offices 411, 412, and 461 on the EIT office diagram attached as Exhibit A.

m.    All tools, hardware and spare parts remaining from previous projects located throughout the EIT office.

n.    Eight (8) total workstations, each containing a desk, bridge, credenza, hutch, and matching chair identified in offices 462, 463, 465 and 466 on the EIT office diagram attached as Exhibit A.

o.    All bookcases, desks, tables, chairs and contents identified as office 459 on the EIT office diagram attached as Exhibit A.

p.    All equipment, photos and industrial artwork, framed or otherwise, hanging on the walls or stored throughout the EIT office.  This does not include signage on the exterior of the office.

q.    Two (2) grey service carts.

r.    The 2008 Ford F-150 Pickup, VIN# 1FTPX12V88FB65182.

s.    Either the 2008 Honda Accord LXP, VIN#1HGCP26468All8060, the 2008 Honda Accord EXL VIN#JHMCP26868C002037, or the 2006 Honda Accord VP, VIN# 1HGCM56146A040164.

    t.  The work in progress known as the GE Ocotillo Project, Job No. 1718, including all parts thereof. **(the "EIT Property")**.

4.2 Purchaser agrees that Seller shall retain the laptop and desktop computers in Rebecca Tomlinson's office and all corporate and financial records, paper and electronic, necessary to complete the administration of this bankruptcy estate.

4.3 The EMF estate being sold includes, all assets [ the equipment, tools, scrap metal, inventory (unless otherwise marked for work in progress) and rolling equipment] located in St. George, Utah and Murray, Utah, including without limitation the assets described in the attached **Exhibit B (the "EMF Property")**.

4.4 The parties have determined that the purchase price offered by SISU is allocated as follows:

    a.  the EIT Property has a value of $455,000.00:

      i.  the intellectual and personal property: $100,000.00; and

      ii.  the GE work in progress: $355,000.00.

    b.  the EMF Property has a value of $765,000.00.

4.5 The Purchaser shall then endeavor to collect the dollar amounts of the outstanding accounts receivable of EMF generated in St. George and Murray, Utah, and remit the same to the Seller upon the following terms and conditions:

    a.  The first $500,000.00 for the EMF accounts receivable (booked and not booked) from St. George Steel at St. George, Utah, shall be remitted to the Seller, who shall retain 100% of the collected amount. All receivables shall be remitted directly to the Seller. The accounts receivable shall remain property of the Seller and the Seller will appoint the Purchaser as an agent of Seller to collect said accounts receivable.

    b.  $250,000.00 of the above referenced accounts receivable are due March 1, 2017, or within 90 days after completion of the Purchase and Sale Agreement, whichever occurs last (this amount shall be guaranteed to the Seller no matter what amount of accounts receivable are ultimately collected unless closing occurs after January 19, 2017 in which case the guaranteed provision is deleted, but all other terms remain unchanged.). All

Accounts Receivable referenced herein are based on the accounts receivable ledger attached hereto as **Exhibit G**. These are the accounts receivable due at the time of Chapter 7 filing. Any of the listed accounts receivable that have been collected by the Trustee subsequent to bankruptcy filing, shall be accrued and counted towards the initial $250,000.00 collected. The intent of the parties is that if the full amount of $250,000.00 is not collected by March 1, 2017 and closing occurs on or before January 19, 2017, that Purchaser shall immediately remit the amount equal to the deficit in collected accounts receivable below the guaranteed sum of $250,000.00 (the "Shortfall Amount") so that the total amount received by the Seller shall total $250,000.00. Provided however, Purchaser shall be able to recoup and retain a dollar amount of the collected receivables collected thereafter, equal to the Shortfall Amount, out of the first account receivable dollars collected after March 1, 2017. Provided further, Purchaser shall continue to use its best efforts to collect the remaining accounts receivable and remit the same to Seller until another $250,000.00 is collected and remitted to Seller.

c.      After the Seller has received the guaranteed or first $250,000.00 and the additional $250,000.00 from the collected accounts receivable, Purchaser shall continue to use its best efforts to collect the remaining accounts receivable, and the Seller and the Purchaser shall then split all collected accounts receivable on a 70/30 basis with the Seller receiving 70% of the collected accounts receivable and the Purchaser receiving 30% of the collected accounts receivable.

d.      Purchaser shall remit to Seller 100% of said accounts receivable, but Seller shall then promptly account for and pay to Purchaser 30% of the amount of the collected accounts receivable in accordance with the above split.

4.6      The Purchaser will be exempt from state sales taxes or if not, those taxes shall be remitted to Seller by Purchaser and Seller shall remit the tax to the Oklahoma Tax Commission.

4.7      It is understood by the parties hereto that the information, documents and instruments delivered to Purchaser by Seller are of a confidential and proprietary nature. Purchaser agrees that it will maintain the confidentiality of all such information, documents, and instruments pending closing. Upon closing, Purchaser's confidentiality covenants shall be terminated. If the closing with Purchaser does not occur, then Purchaser's confidentiality covenants shall continue and Purchaser agrees that it will return all information, documents, and instruments to Seller. Purchaser recognizes that any breach of this Section may result in irreparable harm to Seller and Seller shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of proving actual damages or posting a bond, in addition to all of Seller's other legal and equitable remedies.

5.

## CONDITIONS TO CLOSING

5.1     Purchaser's Representations and Warranties.  Purchaser represents and warrants to Seller that:

(a)     If Purchaser is a business entity, Purchaser is duly organized and in good standing under the laws of the state of its organization, as of the Closing will be qualified to do business in the State and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all duties and obligations imposed upon it hereunder, and Purchaser has obtained all necessary corporate authorizations required in connection with the  execution, delivery and performance of this Agreement and has obtained the consent of all entities and parties necessary to bind Purchaser to this Agreement;

(b)     Neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions or provisions of any agreement or instrument to which Purchaser, or any related entity or affiliate of Purchaser, is a party or by which Purchaser, any related entity or affiliate of Purchaser or any of Purchaser's assets is bound;

(c)     This Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, moratorium or other laws affecting the enforcement of creditors' rights generally, or by principles of equity, whether applied in a proceeding at law or in equity; and

(d)     Purchaser is not a person or entity with whom Seller is restricted from doing business under applicable laws relating to national security (such as the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, commonly known as the "USA Patriot Act") and executive orders and regulations relating to such applicable laws.  In this regard, Purchaser's attention is further directed to **Exhibit F** attached to this Agreement and incorporated herein by reference and made a part hereof for all purposes.  Prior to Closing, Purchaser agrees to complete and deliver to Seller an anti-money-laundering form as required by Seller, at Seller's sole discretion.

(e)     Certain of Purchaser's owners are indirect minority owners of the parent company of EIT and EMF and were previously employees of EIT or its affiliates.

5.2     Pending closing, Seller shall grant Purchaser full access to the Property and the related businesses.  The Seller believes that it has given due notice to all persons holding liens in the Property and shall, at the Purchaser's request, confirm that it has notified all such lienholders.

6.
NO REPRESENTATIONS OR WARRANTIES BY SELLER;
ACCEPTANCE OF THE PROPERTY

6.1    PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, EITHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (B) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (C) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, AND (D) COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS.  ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE AND RELEASE AS OF THE CLOSING ALL OBJECTIONS, SUITS, CAUSES OF ACTION, DAMAGES, LIABILITIES, LOSSES, DEMANDS, PROCEEDINGS, EXPENSES AND CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION.  SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND

BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE FOR THE PROPERTY HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE AND HOLD HARMLESS SELLER FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF PURCHASER'S OWNERSHIP, LEASING, USE, OPERATION, MAINTENANCE OR MANAGEMENT OF THE PROPERTY. THE PROVISIONS OF THIS SECTION 5.1 ARE AN IMPORTANT BASIS OF THE BARGAIN INDUCING SELLER TO CONVEY THE PROPERTY. THE PROVISIONS OF THIS SECTION 5.1 SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

## 7.
## CLOSING

7.1     Closing. The Closing shall occur on the Closing Date (unless the parties mutually agree in writing upon another place, time or date), whereby Seller, Purchaser and their attorneys need not be physically present at the Closing and may deliver documents and monies to the Seller by overnight air courier or other means.

7.2     Closing Costs. Intentionally omitted.

7.3     Seller's Obligations at the Closing. At the Closing, Seller shall deliver to Purchaser the following:

(a)     Bill of Sale. Bill of Sale (the "Bill of Sale") executed by Seller, conveying the Property to Purchaser.

(b)     Evidence of Bankruptcy Court Approval. Such documents of Seller as shall be reasonably required by the Purchaser to evidence Seller's authority to consummate the transactions contemplated by this Agreement in accordance with orders entered in the subject bankruptcy proceedings.

(c)     Closing Statement. A closing statement (the "Closing Statement") executed by Seller, setting forth the debits and credits in connection with the transaction evidenced by this Agreement.

(d)     Vehicle Titles, etc.     Endorsements of vehicle titles and any other conveyance documents for the Property customarily used and reasonably requested by Purchaser.

7.4     Purchaser's Obligations at the Closing. At the Closing, Purchaser shall deliver to Seller the following:

(a)    Purchase Price. The cash portion of the Purchase Price (plus or minus prorations) by wire transfer of immediately available funds.

(b)    Reserved.

(c)    Evidence of Authority. Such organizational and authorizing documents of Purchaser as shall be reasonably required by authorizing Purchaser's acquisition of the Property pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

(d)    Certification. Taxpayer I.D. Certificate executed by Purchaser, in the form attached to this Agreement as Exhibit D.

(e)    Closing Statement. The Closing Statement executed by Purchaser.

## 8.
## RISK OF LOSS

Intentionally omitted.

## 9.
## DEFAULT

9.1    Breach by Seller. If Seller fails to comply with this Agreement, Purchaser may terminate this Agreement and exercise any and all remedies at law or equity against the Seller. This provision shall survive the closing.

9.2    Breach by Purchaser. If Purchaser fails to comply with this Agreement, Seller may terminate this Agreement and exercise any and all remedies at law or equity against the Purchaser. This provision shall survive the closing.

## 10.
## FUTURE OPERATIONS

Intentionally omitted.

## 11.
## MISCELLANEOUS

11.1    Notices. All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective either (a) on the date personally delivered to the address indicated herein, as evidenced by written receipt therefor, whether or not actually received by the person to whom addressed; (b) upon deposit in the United States mail if by certified or registered mail, return receipt requested, addressed to the intended recipient at the address indicated herein; (c) upon confirmed transmission, if delivered by facsimile, addressed to the intended recipient at the fax number noted herein; or (d) on the day deposited into the custody of a nationally recognized overnight delivery service such as Federal

Express Corporation for overnight next day delivery, addressed to such party at the address specified in Section 1.1 hereof (unless changed by similar notice in writing given by the particular person whose address is to be changed).

11.2     Entire Agreement.  This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations made by either party relative to the subject matter hereof, which are not expressly set forth herein.  Any and all letters of intent entered into by the parties hereto are hereby terminated and of no further force or effect.

11.3     Amendment.  This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

11.4     Headings.  The captions and headings used in this Agreement are for convenience only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

11.5     Time of Essence.  **TIME IS OF THE ESSENCE OF THIS AGREEMENT**; however, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the State, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

11.6     Governing Law.  This Agreement shall be governed by the laws of the State of Oklahoma and the laws of the United States pertaining to transactions in the State, without reference to its choice of law principles.

11.7     Successors and Assigns: Assignment.  This Agreement shall bind and inure to the benefit of Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns.  Purchaser shall not assign Purchaser's rights under this Agreement without the prior written consent of Seller, which consent may be withheld absolutely; provided, however, upon five (5) business days prior written notice, Purchaser may assign this Agreement to any entity which controls, is controlled by or under common control with Purchaser, without Seller's consent.  Purchaser hereby agrees that any such assignment to the proposed assignee shall not release Purchaser from any of its duties, liabilities or obligations under this Agreement.  In the event Seller consents to an assignment or Purchaser assigns its rights under this Agreement as provided in this Section 11.8, Purchaser and such assignee shall execute and deliver an Assignment of Purchase and Sale Agreement in the form attached hereto as Exhibit E (the "Assignment of Agreement").  Any subsequent assignment may be made only with the prior written consent of Seller.  This Agreement is solely for the benefit of Seller and Purchaser, there are no third party beneficiaries hereof.  Any assignment of this Agreement in violation of the foregoing provisions shall be null and void.

11.8     Invalid Provision.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never composed a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

11.9 Attorneys' Fees. In the event a lawsuit is filed in connection with this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees and expenses incurred in such suit.

11.10 Multiple Counterparts; Electronic Signatures. This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature. Further, this Agreement may be executed by facsimile or by portable document format (.pdf) signature, such that execution of this Agreement by facsimile or by portable document format (.pdf) signature shall be deemed effective for all purposes as though this Agreement was executed as a "blue ink" original.

11.11 Exhibits. The following exhibits are attached to this Agreement and are incorporated into this Agreement by this reference and made a part hereof for all purposes:

(a) Exhibit A, EIT office diagram.
(b) Exhibit B, EMF Property, the list of equipment, rights and information to be conveyed pursuant to the Purchase and Sale Agreement.
(c) Exhibit C, the form of the Bill of Sale.
(d) Exhibit D, the form of the Taxpayer I.D. Certificate.
(e) Exhibit E, the form of the As-Is Certificate.
(f) Exhibit F, Special Provisions Regarding National Security.
(g) Exhibit G, EMF Accounts Receivable.

11.12 No Recordation. Intentionally omitted.

11.13 Merger Provision. Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement shall merge with the instruments executed at Closing, shall terminate at Closing and shall not survive Closing.

11.14 **Waiver of Consumer Rights. PURCHASER HEREBY REPRESENTS AND WARRANTS TO SELLER THAT (A) PURCHASER IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION, (B) PURCHASER IS REPRESENTED BY LEGAL COUNSEL, (C) PURCHASER IS SEEKING TO ACQUIRE THE PROPERTY, WHICH WILL NOT BE USED AS A FAMILY RESIDENCE, FOR A CONSIDERATION THAT EXCEEDS $500,000.00, AND (D) PURCHASER IS A SOPHISTICATED INVESTOR AND HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT ENABLE IT TO EVALUATE THE MERITS AND RISKS OF THIS TRANSACTION. PURCHASER HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS, REMEDIES AND BENEFITS UNDER ANY LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS, WHETHER FEDERAL, STATE OR LOCAL. AFTER CONSULTATION WITH AN ATTORNEY OF PURCHASER'S OWN SELECTION, PURCHASER VOLUNTARILY**

CONSENTS TO THIS WAIVER.  PURCHASER COVENANTS NOT TO SUE SELLER UNDER ANY SUCH CONSUMER PROTECTION LAW.

11.15  **Jury Waiver**.  **PURCHASER AND SELLER DO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY PURCHASER AT CLOSING OR SELLER AT CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER WITH THIS AGREEMENT OR THE PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY PURCHASER AT CLOSING AND SHALL SURVIVE THE CLOSING OR TERMINATION OF THIS AGREEMENT.**

11.16  Rule of Construction.  Intentionally omitted.

11.17  Further Assurances.  Pending and following the closing, each of the parties shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested to carry out the provisions of this Agreement and to give effect to the transactions contemplated by this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement.

PURCHASER:

SISU ENERGY & ENVIRONMENTAL, LLC,
an Oklahoma limited liability company

Date of Execution by Purchaser:

1/9/2017 , 2017

By: _____
Name: _____ John  HARE
Title: __ President & CEO

SELLER:

Scott P. Kirtley, Trustee in bankruptcy for
EXPRESS INTEGRATED TECHNOLOGIES,
LLC, Case No. 16-12042-M, and
EXPRESS METAL FABRICATORS, LLC,
Case No. 16-12041-M

Date of Execution by Seller:

Jan. 9 , 2017

_____
Name: Scott P. Kirtley
Title: Trustee

## EXHIBIT A

## EIT OFFICE DIAGRAM



## EXHIBIT B

## EMF PROPERTY

ST. GEORGE STEEL
FIXED ASSET

| SGS Location | Description | Serial # | Acquisition Date |
|---|---|---|---|
| | **OFFICE EQUIPMENT** | | |
| | **St. George:** | | |
| St George Office | Electronic timekeeping system-Legiant | (non transferable) | 5/31/07 |
| St George Office | SDS/2 detailing software | (non transferable) | 7/10/07 |
| St George Office | Network File Server(server2) | | 8/8/08 |
| St George Office | AutoCAD 2012-additional license | (non transferable) | 5/5/2011 |
| St George Office | Dell PowerEdge T610 server | 00168-271-441-101 | 7/20/2011 |
| St George Office | Sharp Color Copier MX-4111N | 15021639 | 11/30/2011 |
| | *Subtotal-St George Office Equip* | | |
| | **FABRICATING EQUIPMENT** | | |
| | **St. George:** | | |
| St George Shop | Sullair TS32-300 Compressor | 003-117798 | 5/99 |
| St George Shop | P & H New Hevi-lift Hoist | N34CN31G | 6/99 |
| St George Shop | Lincoln DC600 Welder(1201) | U1990309410 | 1/00 |
| St George Shop | Lincoln DC600 Welder(1205) | U1990309341 | 1/00 |
| St George Shop | Lincoln LN8 Wire Feed | U1990835494 | 1/00 |
| St George Shop | Lincoln LN8 Wire Feed | U1990835495 | 1/00 |
| St George Shop | Lincoln DC1000 Power Source | U1990502071 | 5/00 |
| St George Shop | Lincoln DC1000 Power Source | U1000105305 | 5/00 |
| St George Shop | Lincoln LN-9 Feeder | U1990613841 | 5/00 |
| St George Shop | Lincoln LN-9 Feeder | U1990300647 | 5/00 |
| St George Shop | Miller 450amp Welder & wire feeder | JB467489/JE830183 | 8/00 |
| St George Shop | Miller 650amp Welder & Lincoln wire feeder | JB525738/U1951110710 | 8/00 |
| St George Shop | Lincoln DC600 Welder | U1000405983 | 2/01 |
| St George Shop | Lincoln DC600 Welder | U1001012309 | 2/01 |
| St George Shop | Lincoln DC600 Welder | U1000934757 | 2/01 |
| St George Shop | Lincoln DC600 Welder | U1001120983 | 2/01 |
| St George Shop | Lincoln LN8-CV Wire Feeder | U1001004463 | 2/01 |
| St George Shop | Lincoln LN8-CV Wire Feeder | U1001004462 | 2/01 |
| St George Shop | Lincoln LN8-CV Wire Feeder | U1001004441 | 2/01 |
| St George Shop | Lincoln LN8-CV Wire Feeder | U1001004437 | 2/01 |
| St George Shop | Ingersoll Port. Air compressor | 221786 | 3/01 |
| St George Shop | Sullair Air Compressor TS32-300 | 003-125438 | 5/01 |
| St George Shop | Pandjiris 11" vertical welding manipulator | 800-4432-5 | 6/01 |
| St George Shop | Unique Readco Welding Positioner | | 6/01 |
| St George Shop | Ransome 20,000 lb welding positioner | | 6/01 |
| St George Shop | 90 Ton Tank turning rolls | | 6/01 |
| St George Shop | Used Worthington 400 P weilding positioner | 53222 | 7/01 |
| St George Shop | Bertsch Model 87-10 four roll machine | | 7/01 |
| St George Shop | Used Miller Delta Welder 652 & feeder | LB025219 | 9/02 |
| St George Shop | Portable Drilling Machine-Hearn | | 2/03 |
| St George Shop | Used Portable Drilling Machine-Hearn | | 2/03 |
| St George Shop | Uni-Bug II Welding Kit | 0300603 | 6/03 |
| St George Shop | Lincoln LT-7 Tractor subarc welder | U1030809477 | 9/03 |
| St George Shop | Uni-Bug II Welding Kit | 0021003 | 10/03 |
| St George Shop | Sidewinder M2 Solvent Recycler | | 8/04 |
| St George Shop | 3 Miller Welding Stations | AirGas3104581144 | 7/22/05 |
| St George Shop | Paint Storage shed-Job 9996.31 (container) | | 4/30/06 |

ST. GEORGE STEEL
FIXED ASSET

| SGS Location | Description | Serial # | Acquisition Date |
|---|---|---|---|
| St George Shop | GEKA Ironworker Model hydracrop 110AD | 20943 | 8/2/06 |
| St George Shop | Case 580B Backhoe w/forks (doesn't work) | 5227405 | 6/29/06 |
| St George Shop | Used 1996 JLG Propane manlift (damaged) | 034871030025340 | 8/24/06 |
| St George Shop | Yale Forklift Model GDP360EB (short mast) | B877E015072 | 9/18/06 |
| St George Shop | DPH 125 Hydraulic profile roll | 440V 3PH | 12/21/06 |
| St George Shop | Trailblazar 302 Onan Welder | LG092832 | 12/28/06 |
| St George Shop | 60' JLG Boomlift Model 60H (damaged) | 3000023868 | 9/14/07 |
| St George Shop | Invertec V350-PRO welder & feeder | V1071007232 | 12/14/07 |
| St George Shop | Invertec V350-PRO welder & feeder | V1071007233 | 12/14/07 |
| St George Shop | Invertec V350-PRO welder & feeder | V1071002940 | 12/14/07 |
| St George Shop | Shop camera monitoring system-Peak Alarm (installed) | | 3/31/08 |
| St George Shop | Used Massey Ferguson MF 50A Tractor (scrap) | 1664 51 MIC | 1/18/08 |
| St George Shop | 3- 2T electric chain hoists NER020L-20 | NER1A 85SY5363-00133203/20 | 9/12/08 |
| St George Shop | Precision TIG 375 welder | U1080702704 | 12/10/08 |
| St George Shop | Pythonx structural fabrication system | 3HAC-17851-2 | 12/15/08 |
| St George Shop | Wel-Handy Multi Stitch Model 61001072 | 078327 | 9/30/2009 |
| St George Shop | Nelson Series 4500 Model 101 stud gun | 1012004 | 2/17/2010 |
| St George Shop | Nelson NS20HD Hvy Duty stud gun | HGC1080 | 3/29/2010 |

## ST. GEORGE STEEL
## FIXED ASSET

| SGS Location | Description | Serial # | Acquisition Date |
|---|---|---|---|
| St George Shop | Miller Trailblazer welder | A107200453 | 4/28/2010 |
| St George Shop | Used 80-ton tank turning rolls w/idlers & misc | | 4/29/2010 |
| St George Shop | Ceram 35 CF2000 x-ray machine | 2108300/06(control) & 29770- | 6/29/2010 |
| St George Shop | Shop camera monitoring system (computers) | | 10/1/2010 |
| St George Shop | Morris Radial Arm Drill Model G504 | R77008243 | 3/22/2011 |
| St George Shop | 2008 PCS 4000HD Plasma cutting machine | | 12/14/2011 |
| St George Shop | Powermax 85 welder w/ 50' hand torch | 85-008256 | 2/9/2012 |
| St George Shop | Frejoth International CZE-20 tank turning rolls | #N4862 | 6/5/2012 |
| St George Shop | JMT DZG-40 tank turning rolls | #JMT123 | 6/5/2012 |
| St George Shop | Gator UTV for maintenance department | #MOHP4GX019156 | 7/19/2012 |
| St George Shop | Used 1984 Amada Angle Machine (Job 9995.14) | Ser #830110 | 2/28/2014 |
| St George Shop | Lincoln Pulse welder S500 | Ser #U1130901756 | 3/13/2014 |
| St George Shop | DGZ-60 60-ton tank turning roll | Serial# SS 2140521 | 7/2/2014 |
| St George Shop | DSQC639 Main Computer for Python | Serial # 3HAC041443-003 | |
| St George Shop | Drop Deck Trailer for moving items in yard/shop (used) | Serial # 1DA71C708DM007294 | 10/3/2014 |
| St George Shop | Airgas USA Welding System 230/460V | Inv 9035471504 | 1/20/2015 |
| St George Shop | Transferred from ST2 -500# Welding Positioner | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - 500# Welding Positioner | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - 3-Ton Capacity Drive Roll & Kit | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - 3 Ton Idler Roll | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Roller Conveyor for Shop | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Fixtures for Shop | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Print Stand for Shop Dwgs | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Channels for conveyor sections | USED ? | 4/22/2016 |
| St George Shop | Transferred from ST2 - Channels for conveyor sections | USED ? | 4/22/2016 |

*Subtotal-St George Mach & Equip*

C:\Users\skirtley\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BZ2UGW3X\SGS Asset List 10-2016

Case 16-12042-M   Document 91   Filed in USBC ND/OK on 01/09/17   Page 33 of 42

ST. GEORGE STEEL
FIXED ASSET

| SGS Location | Description | Serial # | Acquisition Date |
|---|---|---|---|
| | **AUTOS AND TRUCKS** | | |
| | St. George: | | |
| St George Autos | 89 Great Dane Trailer (GW Lease #D4321) | 1GRDM9025KM034321 | 5/17/91 |
| St George Autos | 89 Great Dane Trailer (GW Lease #D4304) | 1GRDM9025KM034304 | 5/17/91 |
| St George Autos | 89 Great Dane Trailer (GW Lease #D4324) | 1GRDM9020KM034324 | 5/18/92 |
| St George Autos | 89 Great Dane Trailer (GW Lease #48706) | 1GRDM9023KM089706 | 6/5/92 |
| St George Autos | 93 Dodge Ram 350 Pick-up | 1B7ME36CXPS112602 | 10/19/92 |
| St George Autos | 86 Trailmobile Drop Flat Bed Trlr (scrap) | 1PTH43DJ1G7720503 | 7/13/95 |
| St George Autos | 89 Cozad 16-tire basket trailer | 1C9L12201K1167056 | 3/29/96 |
| St George Autos | 96 Murray Dolly Trailer | UTT17435 | 9/19/96 |
| St George Autos | 95 Ford F150 Pickup-Trucking | 1FTEF15N0SNA54242 | 4/10/97 |
| St George Autos | 97 Fontaine EDFT Step Deck Trailer | 13N248309V1577131 | 5/2/97 |
| St George Autos | 97 Trailmobile Flatbed Trailer F71t-5UAA | 1TPF71TH6V9003940 | 5/29/98 |
| St George Autos | Yale Forklift Model GDP360EA | A877D01563W | 12/20/99 |
| St George Autos | Yale Forklift Model GDP360EA | A877D01564W | 12/20/99 |
| St George Autos | Yale Forklift Model GDP360EA | A877D01537W | 12/20/99 |
| St George Autos | 99 Ford F355 Pickup-Trucking | 1FTWX33F5XEA21124 | 7/25/00 |
| St George Autos | 96 Fontaine DDF Stretch FB trailer & 3rd axel unit | 13N653298T1571805 | 10/24/00 |
| St George Autos | 01 Fontaine low boy trailer | 13N65330211597555 | 3/5/01 |
| St George Autos | 01 Chevy Tahoe-Mike | 1GNEK13T01R159987 | 3/19/01 |
| St George Autos | 96 Volvo Model WIA64TTES Truck (See also rebuilt engine | 4V4WDBCH5TN733216 | 3/29/01 |
| St George Autos | 96 Volvo Model WIA64TTES Truck (See also rebuilt engine | 4V4WDBCH7TN733217 | 3/29/01 |
| St George Autos | 02 Kenworth T800B Truck Tractor | 1XKDDB9X42R889230 | 9/17/01 |
| St George Autos | 02 Kenworth T800B Truck Tractor | 1XKDDB9X62R889231 | 9/17/01 |
| St George Autos | 02 Kenworth T800B Truck Tractor | 1XKDDB8X12J893573 | 1/2/02 |
| St George Autos | 2007 Manac Trailer x-flat | 2M 512146671111474 | 10/16/06 |
| St George Autos | 1996 Wabash flatbed trailer 48' X 102" | 1JJF448272TL323354 | 5/17/07 |
| St George Autos | 1996 Wabash flatbed trailer 48' X 102" | 1JJF48270TL378031 | 5/17/07 |
| St George Autos | 2003 Ford Windstar Van | 2FMZA51443BB18778 | 6/21/07 |
| St George Autos | 05 Ravins Trailer | 1R1F248295K550826 | 7/13/07 |
| St George Autos | 07 Ford Ranger 4X2 Supercab pickup(Evert) | 1FTYR14U57PA46596 | 7/21/07 |
| St George Autos | 07 GMC Sierra CC/SB 4WD pickup(Ashley) | 1GTHK23637F561308 | 10/31/07 |
| St George Autos | 2007 Honda ATV for yard | 1HFTE344374011175 | 12/9/08 |
| St George Autos | Used Cozad Jeep Dolly & stinger | | 2/4/2009 |
| St George Autos | 2005 Walton Trailer (#2A92B53385R023114) | | 11/7/2012 |
| St George Autos | 2010 Honda Civic GX Sedan (#19XFA4F55AE000117) | | 1/2/13 |

*Subtotal-St George Vehicles*

## EXHIBIT C

## BILL OF SALE

Scott P. Kirtley, Trustee in bankruptcy estates of Express Integrated Technologies, LLC, Case No. 16-12042-M, and Express Metal Fabricators, LLC, Case No. 16-12041-M ("Grantor"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid by Sisu Energy & Environmental, LLC, an Oklahoma limited liability company ("Grantee"), the receipt and sufficiency of which are hereby acknowledged, has Granted, Sold, Assigned, Transferred, Conveyed, and Delivered and does by these presents Grant, Sell, Assign, Transfer, Convey and Deliver unto Grantee, all of Grantor's rights, titles, and interests in and to the Property more particularly described on Exhibit A attached hereto and made a part hereof for all purposes.

This instrument is being furnished by Grantor to Grantee pursuant to that certain Purchase and Sale Agreement (as may have been amended, modified and assigned, the "Agreement") dated effective as of _____, 2017, made and entered into by and between Grantor, as seller, and Sisu Energy & Environmental, LLC, an Oklahoma limited liability company, as purchaser. All capitalized words and phrases utilized herein and not defined shall have the meaning ascribed to them in the Agreement.

Grantor and Grantee hereby covenant and agree as follows:

(i)     Except as aforesaid, this instrument shall bind and inure to the benefit of the parties and their respective successors, legal representatives and assigns.

(ii)    Neither this instrument nor any term, provision, or condition hereof may be changed, amended or modified, and no obligation, duty or liability or any party hereby may be released, discharged or waived, except in a writing signed by all parties hereto.

(iii)   This instrument may be executed in a number of identical counterparts, each of which for all purposes is deemed an original, and all of which constitute collectively one agreement; but in making proof of this instrument, it shall not be necessary to produce or account for more than one such counterpart. Further, this instrument may be executed by facsimile or by portable document format (.pdf) signature, such that execution of this instrument by facsimile or by portable document format (.pdf) signature shall be deemed effective for all purposes as though this instrument was executed as a "blue ink" original.

(iv)    Grantee hereby agrees that the conveyance of the property described in this instrument is subject to the terms, provisions and agreements set forth in Section 5.1 of the Agreement.

IN WITNESS WHEREOF, Grantor and Grantee have executed this Bill of Sale, Assignment and Assumption of Contracts and Leases to be effective as of the ____ day of _____, 2017.

GRANTEE:

SISU ENERGY & ENVIRONMENTAL, LLC, an Oklahoma limited liability company

Date of Execution by Grantee:

_____, 2017

By: _____
Name: _____
Title: _____

GRANTOR:

Scott P. Kirtley, Trustee in bankruptcy for EXPRESS INTEGRATED TECHNOLOGIES, LLC, Case No. 16-12042-M, and EXPRESS METAL FABRICATORS, LLC, Case No. 16-12041-M

Date of Execution by Grantor:

_____, 2017

_____
Name: Scott P. Kirtley
Title: Trustee

## EXHIBIT D
## TAXPAYER I.D. CERTIFICATE

In connection with certain Internal Revenue Service reporting requirements imposed upon Seller, the undersigned ("Purchaser") hereby certifies that listed below is Purchaser's address and taxpayer I.D. number, true and correct as of the Closing Date.

Address: _____

_____

_____

Taxpayer I.D. No.:_____

Purchaser hereby consents to Seller's release of the above information in connection with any reporting requirements imposed upon Seller by any governmental authority.

SISU ENERGY & ENVIRONMENTAL, LLC,
an Oklahoma limited liability company

By: _____
Name: _____
Title: _____

## EXHIBIT E

### AS-IS CERTIFICATE

This As-Is Certificate (this "Certificate") dated this ____ day of _____, 2017, is executed and delivered by SISU ENERGY & ENVIRONMENTAL, LLC, an Oklahoma limited liability company ("Grantee") unto Scott P. Kirtley, Trustee of the bankruptcy estates of Express Integrated Technologies, LLC, Case No. 16-12042-M, and Express Metal Fabricators, LLC, Case No. 16-12041-M ("Grantor").

### RECITALS

A.      Reference is hereby made to that certain Purchase and Sale Agreement (as amended and/or assigned from time to time, the "Agreement") dated effective as of _____, 2017, made and entered into by and between Grantor, as seller, and SISU ENERGY & ENVIRONMENTAL, LLC, an Oklahoma limited liability company, as purchaser, in connection with among other things, Property as described on Exhibit A attached hereto and made a part hereof for all purposes. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Grantee hereby certifies, reaffirms and confirms unto Grantor the terms, provisions and agreements set forth in Section 5.1 of the Agreement.

IN WITNESS WHEREOF, Grantee has executed and delivered this Certificate as of the date set forth above.

SISU ENERGY & ENVIRONMENTAL, LLC,
an Oklahoma limited liability company

By: _____
Name: _____
Title: _____

## EXHIBIT F

### SPECIAL PROVISIONS REGARDING NATIONAL SECURITY

By its execution of this Agreement, Purchaser hereby makes the following additional representations, warranties and covenants to Seller, all of which shall survive the execution and delivery of this Agreement and the Closing described herein.

(a)     Not a Prohibited Person.  Purchaser (hereinafter sometimes referred to as the "Representing Party") hereby represents and warrants to Seller that the Representing Party is not now, nor shall it be at any time during the term of this Agreement, a "Person" (as hereinafter defined) with whom a "U.S. Person" (as hereinafter defined) is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under U.S. law, regulation, executive orders or the "Lists" (as hereinafter defined).

(b)     No Investigations.  Representing Party further represents and warrants to Seller that neither the Representing Party, nor any party affiliated with the Representing Party (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the U.S. would be predicate crimes to money laundering, or any violation of any "Anti-Money Laundering Laws" (as hereinafter defined); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(c)     Compliance.  Representing Party further represents and warrants to Seller that the Representing Party is in compliance with, and during the term of this Agreement shall comply with, any and all applicable provisions of the "Patriot Act" (as hereinafter defined).  Purchaser agrees to execute any and all documents and take such further actions as may be required by Seller or the Title Company in connection with these representations or otherwise with respect to the Patriot Act.

(d)     Prohibited Contracts.  Purchaser may not assign any of its rights under this Agreement to any Person who is listed on the Lists or who, to the knowledge of Purchaser, is engaged in illegal activities.  Purchaser shall conduct such due diligence as may be reasonably required to comply with the foregoing obligations.  Purchaser shall maintain in its files copies of such due diligence, and shall provide a copy of same to Seller upon the submittal of any assignment or request for consent to assignment.

(e)     Source of Funds.  Purchaser represents and warrants to Seller that Purchaser has taken, and shall continue to take during the term of this Agreement, such measures as are required by law, and those which may from time to time be directed by Seller, in the exercise of its reasonable judgment, to assure that the funds used to pay the Purchase Price are derived from permissible sources and transactions that do not violate U.S. law or, to the extent such funds originate outside the U.S., do not violate the laws of the jurisdiction in which they originated.

(f)     Notification.  If Purchaser obtains knowledge that it, or an entity affiliated with it, or the employees of any of Purchaser, becomes listed on the Lists or is indicted, arraigned, or custodially detained on charges involving Anti-Money Laundering Laws, then Purchaser shall

immediately notify Seller upon receipt of knowledge of such events, and Purchaser shall with respect to any employees, immediately remove such employee from employment.

(g)     Definitions. "Person" means any individual, including any officer or employee of the Federal Government, or any group, entity, association, corporation, or foreign power. A "U.S. Person" is a citizen of the United States of America, an entity organized under the laws of the United States of America, its territories or any of the several states, or an entity having its principal place of business within the United States of America or any of its territories. "Lists" mean any lists published by OFAC (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC) including the Specially Designated Nationals and Blocked Persons list.  "OFAC" is the Office of Foreign Assets Control, Department of the Treasury.  "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that (1) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (2) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; or (3) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1.

## EXHIBIT G

### EMF ACCOUNTS RECEIVABLE

Work in Process
Period Ending October 31, 2016

Case 16-12042-M   Document 91   Filed in USBC ND/OK on 01/09/17   Page 42 of 42

| Job # | Customer | Status | likley recover | Unbilled amount | unpaid billings | TOTAL CONTRACT AMOUNT | REVISED CONTRACT PRICE | ESTIMATED COSTS | ESTIMATED GROSS PROFIT | CURRENT ESTIMATED G.P. % | ORIGINAL EXPECTED G.P. % | BILLINGS TO DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N4694 | Technip Stone | Shipped need docs | 122,426 | 157,426 | 83,029 | 207,101 | 268,420 | 242,245 | 26,175 | 9.75 | 17 | 110,994 |
| N4696 | Tech Westlake | Shipped need docs | 253,216 | 413,216 | 81,953 | 811,063 | 822,983 | 857,964 | -34,981 | -4.25 | 14 | 409,767 |
| N4699 | TDW | No value | | 0 | | 5,446 | 10,779 | 7,233 | 3,546 | 32.90 | 14 | 10,779 |
| N4700 | EIT Amon Skid | EIT / Sale | | 321,766 | | 246,193 | 346,305 | 285,000 | 61,305 | 17.70 | 14 | 24,619 |
| J4701 | ClearStream | | 0 | | 34,315 | 35,907 | 34,315 | 25,232 | 9,083 | 26.47 | 14 | 34,315 |
| J4705 | Trillicon tanks | Shipped need docs | 0 | | 106,204 | 175,716 | 177,016 | 160,092 | 16,924 | 9.56 | 14 | 177,016 |
| J4706 | FLSmidth | Shipped need docs | 80,366 | 3,924 | 76,441 | 77,986 | 80,366 | 61,156 | 19,210 | 23.90 | 14 | 76,442 |
| J4707 | Sinclair | Shipped need docs | 17,795 | 17,795 | | 35,589 | 35,589 | 34,233 | 1,356 | 3.81 | 14 | 17,794 |
| S7463 | CS Mining | (turned to Bankrupty) | 0 | | | 404,719 | 531,046 | 379,207 | 151,839 | 28.59 | 20 | 531,046 |
| S7473 | CS Mining | (turned to Bankrupty) | 0 | | | 1,869 | 16,012 | 8,014 | 7,998 | 49.95 | 19 | 16,012 |
| G7495 | ClearStream | | 0 | | 64,945 | 143,338 | 149,945 | 127,428 | 22,517 | 15.02 | 17 | 149,945 |
| S7499 | Freeport | Shipped need docs | 0 | 46,170 | 81,756 | 221,982 | 251,287 | 202,000 | 49,287 | 19.61 | 17 | 205,097 |
| S7500 | EIT Ocotillo | NA will sell direct to customer | 607,651 | | | 1,192,442 | 1,204,232 | 1,231,465 | -27,233 | -2.26 | 1 | 596,581 |
| G7501 | ClearStream | | 0 | | 13,339 | 12,812 | 13,339 | 17,175 | -3,836 | -28.76 | 17 | 13,339 |
| S7503 | EIT S&W | NA will sell direct to customer | 660,665 | | | 50,000 | 1,838,941 | 1,457,478 | 381,463 | 20.74 | 0 | 978,076 |
| S7509 | Saulsbury | Shipped need docs | 9,500 | 19,500 | 104,298 | 613,664 | 673,631 | 765,804 | -92,173 | -13.68 | 15 | 654,131 |
| S7512 | GEA Refrigeration | | 0 | | | 103,420 | 113,342 | 63,670 | 49,672 | 43.82 | 15 | 113,342 |
| G7513 | Phoenix Ind | NA will sell direct to customer | 665,733 | | | 1,160,421 | 1,160,421 | 960,000 | 200,421 | 17.27 | 15 | 494,688 |
| S7518 | Beacon Energy | | 0 | | 22,324 | 22,324 | 22,324 | 10,575 | 11,749 | 52.63 | 16 | 22,324 |
| S7520 | Beacon Energy | | 0 | | 2,422 | 2,422 | 2,422 | 1,031 | 1,391 | 57.43 | 15 | 2,422 |
| S7521 | Intrepid Potash | | 0 | | 37,247 | 35,395 | 40,675 | 39,168 | 1,507 | 3.70 | 15 | 40,675 |
| S7522 | Grand Mesa Elec | | 0 | | 11,626 | 11,626 | 11,626 | 7,397 | 4,229 | 36.38 | 20 | 11,626 |
| G7524 | Hamon Custodis | Hamon Canceled (nothing here) | | 148,500 | | 165,000 | 165,000 | 164,000 | 1,000 | 0.61 | 2 | 16,500 |
| G7526 | Phonix Industrial | PHX direct with Trusteel (nothing here) | | 52,736 | | 97,882 | 97,882 | 80,959 | 16,923 | 17.29 | 15 | 45,146 |
| S7528 | Saulsbury | Shipped need docs | 18,535 | 28,535 | 34,869 | 63,394 | 63,394 | 15,533 | 47,861 | 75.50 | 70 | 34,859 |

Misc

Early-pay disc

| Estimated value | $ 501,935.00 | | 754,770 | | 8,131,272 | 7,204,059 | 927,213 | 11.40 | | 4,787,435 |